[No. 12767. *En Banc.* September 24, 1915.]

GEORGE P. WRIGHT, *Respondent,* v. THE CITY OF TACOMA,
*Appellant.*[1]

MUNICIPAL CORPORATIONS — PUBLIC IMPROVEMENTS — CONTRACTS—
EXHAUSTION OF FUND—REMEDIES OF CONTRACTOR. Where, by the con-
tract, payment for the construction of a pipe line for city water-
works was limited to a special fund to be created by the issuance
of warrants for the estimated cost, together with a specified sum
from the annual gross earnings of the water plant, the exhaustion
of the fund does not bar the contractor from recovering judgment
against the fund for the amount due him on his contract.

SAME—CONTRACTS—DEMURRAGE—WAIVER BY CITY. Where, after a
contract for the construction of a pipe line for city waterworks was
completed, the city paid the sum of $71,444, as the amount admitted
to be due, without making any claim for liquidated damages as de-
murrage for failure to complete the work on time, the claim for de-
murrage is waived, and cannot be offset against the contractor's
claim for extras.

APPEAL — PRESERVATION OF GROUNDS — EXCEPTIONS TO FINDINGS—
SUFFICIENCY. A specific exception to each of the findings by number,
which directs the attention of the court thereto, is sufficient to secure
a review on appeal, although the exception is general in nature,
and part of the facts stated are admitted.

MUNICIPAL CORPORATIONS — PUBLIC IMPROVEMENTS — CONTRACTS—
EXTRAS—RADICAL CHANGE IN PLANS. Under a contract for the con-
struction of a pipe line for city waterworks, providing for extra pay
in case any work or material not prescribed in the plans and speci-
fications shall be ordered by the city, there is a material or radical
change in the contract entitling the contractor to the extra compensa-
tion, where, for a distance of approximately five miles in a detour
around a mountain, the route was changed to pass on the opposite
side of the mountain, at one point a mile distant from the original
route, and along a railroad right of way and cut, over a high divide,
requiring excavation of a hill and a deeper trench, requiring two
"lifts" instead of one and increasing the cost of the excavation.

SAME—PUBLIC IMPROVEMENTS—MODIFICATION—CONSIDERATION FOR
CHANGE. Where, in constructing a pipe line for city waterworks,
a change of route decided upon by the city constituted an extra for
which the contractor was entitled to extra compensation, the waiver
of his right thereto, together with his agreement to excavate a hill

[1]Reported in 151 Pac. 837.

along the line of the new route at a price less than that called for in the contract for earth excavation, constitutes a sufficient consideration for a good faith agreement and resolution of the city council changing the contract and increasing the compensation for hardpan excavation, classed in the contract as "earth," to the amount specified in the contract for the classification of "loose rock"; hence such resolution was not void for want of consideration.

SAME—PUBLIC IMPROVEMENTS—CONTRACTS—CONSTRUCTION—MODIFICATION—INCREASED COSTS. A provision in a contract for a pipe line for city waterworks requiring the pipe to be covered to the depth of not less than two feet, "unless otherwise directed by the commissioner,". must be given a reasonable construction, and does not allow the city to require the contractor to proceed with a refill of only one foot, where, owing to heavy rains and the flat country, the trenches were flooded and the pipe floated, greatly increasing the expense, when it could have been held in place by a refill of two feet; and in such case the cost of restoring the pipe to place must be borne by the city.

SAME—PUBLIC WORK—CONTRACTS—EXTRAS. Where, in the construction of a city pipe line for waterworks, the city council passed a resolution recognizing certain changes which materially increased the cost as an extra, and authorized a payment of the same, the city cannot escape the recognition by claiming that it was without knowledge as to just what had been done on the particular work; and the contractor is entitled to extra compensation at the rate provided for in the contract.

SAME—PUBLIC WORK—CONTRACTS—COMPENSATION. A contract for the construction of a pipe line for city waterworks providing that the contractor shall be paid at the contract price for only the actual work done, allows recovery for clearing right of way at the price bid per acre for clearing, for only the area actually cleared, according to the monthly reports, and not for the total area of the right of way.

SAME. The contractor for the construction of a city pipe line for waterworks cannot justify his failure to lay a section of the pipe at the depth stipulated for by the fact that the pipe as laid, gives good service and the city does not intend to relay it; but the city is entitled to deduct the reasonable cost of relaying the pipe; especially where it appears that it may be compelled to do so to pass at a proper depth under a contemplated highway.

INTEREST—ALLOWANCE—CONTRACT FOR PUBLIC IMPROVEMENTS. Interest is properly allowed upon a balance admitted to be due upon a contract for public improvements, from the time of the acceptance of the contract until paid.

SAME—ALLOWANCE—UNLIQUIDATED DEMAND.   Interest cannot be
allowed prior to judgment for the amount due to a contractor for
extras in the construction of city waterworks, where the items
were in dispute, either as to the work done, the materials furnished,
or the price to be paid, and it was necessary to establish the same
by evidence.

Appeal from a judgment of the superior court for Pierce
county, Claypool, J., entered October 9, 1914, upon findings
in favor of the plaintiff, in an action on contract, tried to the
court.   Modified.

*T. L. Stiles* and *Frank M. Carnahan* (*Davis & Neal*, of
counsel), for appellant.

*Fletcher & Evans* and *Sullivan & Christian*, for respond-
ent.

MAIN, J.—This is the third case to reach this court aris-
ing out of contracts made by the city of Tacoma for the con-
struction of what is known as the Green river water system.
The two prior cases were *McHugh v. Tacoma*, 76 Wash. 127,
135 Pac. 1011, and *International Contract Co. v. Tacoma*,
79 Wash. 311, 140 Pac. 373.   The contract here involved,
in its general provisions, is substantially the same as the
contracts in those two cases.   For a statement of the pre-
liminary facts leading up to the letting of the contract in-
volved in this case, reference is made to the cases mentioned.

By written contract executed on the 11th day of May,
1911, the plaintiff agreed to furnish all of the material and
labor and to construct a pipe line from Green river crossing,
in King county, to a reservoir to be built by the city at or
near McMillan, in Pierce county, and to construct a telephone
line from the headworks on Green river to the reservoir at
McMillan.   The length of the pipe line and telephone line
covered by this contract was approximately twenty-seven
miles.   The estimated amount to which the plaintiff would be
entitled for the performance of the contract was $736,750.95.
The payments were to be made in monthly installments, upon

estimates issued and approved by the commissioner of light and water of the city, to the extent of 85 per cent of the work and materials. The remaining 15 per cent was to be retained by the city until the work had been completed and accepted. The work was accepted by the city on June 1, 1913. Thereafter the plaintiff brought this action for the purpose of recovering upon claims totaling $154,799.50, which claims had been disallowed by the city.

In the complaint, there were 33 items or claims in varying amounts, which made up the total. The complaint also alleged that there was another item of $71,444.84 due when the contract was accepted which had since been paid. Liability was denied by the city. Two affirmative defenses were pleaded; one, that the contract provided there should be no claim against the city except from the proceeds of certain bonds amounting to $2,000,000, which bonds had been completely exhausted by payment for the construction of the system; the other, that by the terms of the contract the work was to be completed on or before May 11, 1912, and if not completed by that time, $250 per day, as liquidated damages for each day over the time mentioned, was to be allowed; and that the work was not completed until May 1, 1913. For this reason, the sum of $85,500 was sought to be set off against any sum which might be found due the plaintiff. To these affirmative defenses, demurrers were interposed and sustained by the trial court. The cause in due time came on for trial before the court sitting without a jury. At the conclusion of the trial, the court made findings sustaining the right of the plaintiff to recover in whole or in part upon 17 of the items set out in the complaint. Upon the remainder of the 33 items, the finding was in favor of the city. To the findings sustaining the right of the plaintiff to recover, the defendant excepted. A judgment was entered in favor of the plaintiff, sustaining his claims upon the items in the sum of $98,042.48. From this judgment, the defendant appeals.

The facts, so far as they may be pertinent to any question to be considered, will be set out in connection with the discussion of that particular question. Before reaching the merits, three preliminary questions will be considered: First, did the court err in sustaining the demurrer to the first affirmative defense; second, did the court err in sustaining the demurrer to the second affirmative defense; and third, are the exceptions to the findings of fact sufficient to cause them to be reviewed.

In the first affirmative defense was pleaded the ordinance under which the pipe line and telephone line were constructed, and the provisions of the contract relative to the fund from which the obligation of the city arising under the contract was to be paid. Section 3 of ordinance No. 3,982, provides.

"That the estimated cost" of the gravity water system therein provided for, "as near as may be, is the sum of $2,-000,000." In § 10 of the ordinance it is provided that the contracts to be entered into for the material and work of constructing the water system shall provide for the payment therefor only in such special water fund warrants, at par, drawn upon and payable "out of the City of Tacoma Special Water Warrant Fund No. 2, hereinafter created and established." This section also provides:

"That whenever during the progress of the work under any contract, any work or material not prescribed in the plans and specifications for said work shall be ordered by resolution of the city council, the same shall be done or furnished by the contractor at actual cost and 10 per cent added."

Section 13 provides that there is created and established in the treasury of the city of Tacoma, a fund to be called,

" 'City of Tacoma Special Water Warrant Fund No. 2,' which fund is created and is to be drawn upon for the sole purpose of defraying the cost and expense of the said addition of the said gravity water system as specified and adopted by Sections 1 and 2 of this ordinance, together with such interest as shall accrue from the warrant obligation issued in payment therefor. Whenever the city of Tacoma shall have

sold any warrants upon the said city of Tacoma Special Water Warrant Fund No. 2, or shall have contracted with any person or corporation for the construction of said gravity water system, or any part thereof, and agreed to pay therefor with warrants on said fund, or with money derived from sale of such warrants, thereafter as long as any obligations are outstanding against said fund, the city treasurer shall set aside into said fund from the gross revenues, earnings and credits derived from the water system now belonging to or which may hereafter belong to said city, the sum of $100,000 each year, if the whole number of warrants authorized to be issued hereunder is the sum of $1,500,000, and the sum of $125,000 each year if the whole number of warrants authorized to be issued hereunder is the sum of $2,000,000."

When the provisions of the ordinance referred to and quoted, together with all the other provisions of the ordinance, are considered, it is apparent, first, that the $2,000,-000 referred to in § 3 is not a limitation of the amount which the system was to cost, but is only an approximate estimate; and second, that there was thereby created a special fund known as "City of Tacoma Special Water Warrant Fund No. 2," out of which fund the cost of the addition to the water system was to be paid. Into this fund there were to go the moneys received from the sale of bonds and warrants, and also a certain amount from the gross earnings of the system so long as any obligation might be outstanding against the fund. The question raised by the ruling upon the demurrer to this affirmative defense is, Will the exhaustion of the special fund, out of which the contractor was to be paid under the ordinance and by the terms of his contract, deny him the right to a judgment against the specified fund for the amount which may still be due? It is not claimed that the contract between the city and the respondent was other than a valid one. The contract being a binding and legal obligation, it would seem that, if there was a balance due under such contract, the contractor would have a right to have such valid claim established by a judgment against the city, provided the judgment limited the collection thereof to

the fund referred to in the ordinance and the contract.  In
*Weaver v. City & County of San Francisco*, 111 Cal. 319,
43 Pac. 972, certain labor had been performed for the city
and claims presented therefor.  These claims were resisted be-
cause, under the constitution of the state of California and
the charter of the city and county of San Francisco, the
board of supervisors were permitted to make expenditures,
for purposes other than those enumerated, only from the sur-
plus revenue of the year when such indebtedness was incurred.
It was there held that, notwithstanding the fact that the
surplus revenue of the year in which the indebtedness was in-
curred was exhausted, the plaintiff had a right to have his
claim established by a judgment of the court.  It was there
said:

"The depletion of the treasury, or the application of the
funds therein to other claims before the trial of the action,
was not a satisfaction of the plaintiff's claim, nor did it con-
stitute a defense to his action.  He was still entitled to a
judgment, with the direction therein that it should be satis-
fied only out of the income or revenue provided by the city
for the fiscal year in which the liability in his favor was in-
curred. . . ."

The form of the judgment rendered in this case may be
here appropriately referred to.  In this judgment it was
provided that it should "be payable out of any warrants,
bonds, or revenues created, or to be created, or authorized
to be created under the provisions of ordinance No. 3982 of
the defendant city, and out of the gross revenues, earnings
and credits of the water system now belonging or which may
hereafter belong to the defendant city."  By the form of this
judgment it can only be collected out of "City of Tacoma
Special Water Warrant Fund No. 2."  The fact that the
fund has been exhausted, if it be a fact, is not a sufficient
reason to deny to the contractor a right to have the liability
of the city under the contract determined by a judgment of
a court of record.  The demurrer to this affirmative defense
was properly sustained.

In the second affirmative defense, was pleaded that pro-
vision of the contract by which the work contracted for
should be completed within one year from the date of the exe-
cution of the contract, and for any delay beyond the specified
time, the sum of $250 per day should be paid by the contract-
or as liquidated damages; and that there was a delay of 373
days, for which the city claimed an offset of $88,500. In
paragraph 33 of the complaint it was alleged that, on
April 1, 1913, and repeatedly thereafter, plaintiff made de-
mand upon the defendant to pay him for the items men-
tioned in the complaint; and that, while the city did not re-
fuse to pay the $71,444.84, it neglected to make this payment
until the 12th day of September, 1913, when it paid the sum
of $60,000; and on the 15th day of October, 1913, the re-
mainder of this undisputed amount of $11,444.84 was paid.
Answering these allegations of the complaint, the city denied
that, on the 1st day of June, 1913, there was due to the plain-
tiff any sum of money greater than $71,845.06, which sum
the city paid the plaintiff "as alleged in paragraph 33 of
said complaint." It is not claimed that, at the time of the
payment of the two items mentioned, the city claimed any
right to demurrage by reason of delay. Neither is it claimed
that demands for the items covered by the complaint had not
been made upon the city as alleged in the complaint. To
this affirmative defense, a demurrer was interposed and sus-
tained by the trial court. It would seem reasonable that, the
city having paid the sum of $71,444.84, as stated, after the
work contracted for had been completed and accepted, with-
out then making any claim to offset the demurrage against
the amount which it claimed and admitted was due, had waived
the right to claim demurrage. The city at all times denied
liability for any sum further than that mentioned. Had
there been any intention to rely upon the demurrage clause
in the contract and claim damages by reason of failure to
complete the contract within the time specified, the city

certainly would have sought to offset this sum against the amount which it admitted to be due.

In *Erickson v. Green*, 47 Wash. 613, 92 Pac. 449, it is distinctly held that liquidated damages provided in a contract for failure to complete the work within the time specified are waived by making a payment upon the contract without claiming such damages up to the time such payment is made; in other words, that the liquidated damages for the time which had expired prior to the making of the payment were waived. It is true the question in that case received little if any discussion; but the question was in the case and was decided. In order to hold that the city, by making the payments mentioned, had not waived its right to claim damages for delay, it would be necessary to overrule that case. We are disposed to adhere to the conclusion reached in that decision, and therefore sustain the ruling in this case upon the demurrer to this affirmative defense.

The respondent opens his brief with a motion directed against the exceptions to the findings of fact. It is claimed that these exceptions are not sufficient to bring before the court a review of the findings. As above stated, upon 17 of the items or claims set out in the complaint, findings were made favorable to the respondent. Many, if not all, of these findings recite facts which are not in dispute. The appellant excepted to each of the findings, to which it objected "on the ground that the facts found therein are not supported by the evidence and are contrary to the evidence and the law applicable to the case, and are immaterial and insufficient to found a judgment against defendant upon." The respondent cites, in support of his contention that the exceptions are general and faulty in not pointing out the specific objection to the finding, the following cases from this court: *Fremont Milling Co. v. Denny*, 12 Wash. 251, 40 Pac. 1062; *Washington Liquor Co. v. Northwest Live Stock Co.*, 18 Wash. 71, 50 Pac. 569; *Payette v. Willis*, 23 Wash. 299, 63 Pac. 254; *Peters v. Lewis*, 33 Wash. 617, 74 Pac.

815; *Horrell v. California etc. Assn.*, 40 Wash. 531, 82 Pac. 889; and *State v. Katon*, 47 Wash. 1, 91 Pac. 250, and some cases from the state of Wisconsin. Those cases, both the Washington and the Wisconsin, are cases in which a general exception was taken to the findings of the court, without pointing out the specific finding which it was claimed was objectionable. The rule is that a general exception made to all the findings, without pointing out specifically the finding to which an exception is taken, is insufficient to cause a review of the findings. But where there is an exception to each finding by number, it is sufficient. *Pickford v. Borland*, 76 Wash. 339, 136 Pac. 128. A specific exception to each finding by number directs the court's attention to the particular finding sought to be reviewed, and for that reason is sufficient. *Burrows v. Kinsley*, 27 Wash. 694, 68 Pac. 332.

In this case, the exceptions are directed to each finding and, under the holding in the last two cases cited, were sufficient to challenge the correctness of the findings. It is true that, in many of the findings to which exceptions are taken, there are facts stated which are either admitted or not controverted. But when the findings are examined by one who is familiar with the record, it is reasonably clear what facts in the findings are objected to. If the appellant were required in its exceptions to segregate in the findings the facts which it excepts to from those which are admitted or not controverted, in some cases an exception would need to be taken to some parts of a sentence and not to other parts of the same sentence. We think the challenge to the exceptions cannot be sustained.

Upon the merits, the larger items allowed by the court will be separately considered; and the smaller items, so far as our view does not coincide with the view of the trial court, will be also separately considered; but no detailed discussion will be given of the consideration of the smaller items where the judgment of the trial court is affirmed.

The respondent claimed for hardpan excavation, in addition to the amount paid by the city, the sum of $36,303; and in the judgment he was allowed $31,028.67. The respondent bases this claim upon his right to have hardpan classified as loose rock. The contract made the specifications on file in the office of the commissioner of light and water a part thereof. According to these specifications, the excavation was to be classified as "solid rock," "loose rock," and "earth." Solid rock was defined to "include all rock in place that cannot be removed without blasting, and also all boulders that exceed fourteen cubic feet in volume." Loose rock was defined to "include all boulders not exceeding fourteen cubic feet and not less than one cubic foot in volume, provided, however, that said loose rock shall comprise more than twenty-five per cent of the volume of the material removed in any one station before said classification shall be allowed." All other material excavated was to be classified as "earth."

After the contract was executed, the respondent prosecuted the work of grubbing, clearing and excavating for the trench, beginning at the head-works and proceeding toward the city. From the head-works to a point some distance west, the route of the pipe line was close along the line of the Northern Pacific railway; but for a distance of approximately five miles, the route left the railway right of way and made a detour around what is called "Cumberland mountain." After the respondent had dug approximately three miles of the trench, and had entered upon the route which passed around Cumberland mountain, he was stopped by injunctions sued out at the instance of property owners over whose property the route passed. It appears that, at the time the contract was let, the city had not acquired the right of way for its pipe line over this portion of the route. After the work was stopped, the officers of the city, after considering the matter, determined to change the route, causing it to pass on the opposite side of Cumberland mountain and along the right of way of the railway. On this route it was neces-

sary to pass over a high divide or hill. Through this hill the railway company had excavated a cut in which its tracks were laid; but this cut was not sufficiently wide to accommodate the pipe line and also the railway tracks. It became necessary, therefore, to excavate this hill, or a portion of it, before digging the trench for the pipe line. The route along the Northern Pacific railway also made it necessary that the trench be dug deeper than over the route that the trench was to be dug as originally contracted for.

When this change was made by the city, the respondent claimed that it was a radical or material change in the contract as originally made, and that it therefore became an extra for which, under the contract, he should be allowed the cost with ten per cent added. This claim gave rise to numerous conversations or discussions between the respondent and the commissioner of light and water, under whose general supervision the contract was to be performed; and at times with other members of the city council. There was also considerable correspondence with reference to it. This discussion and correspondence, as the respondent claims, resulted in an understanding between himself and the city whereby he was to excavate the Bayne cut for thirty cents per cubic yard, and in return therefor, the city was to classify hardpan excavation throughout the entire route as loose rock. Under the contract, the loose rock classification called for the payment of sixteen cents per cubic yard more than the excavation of earth, the contract price for earth excavation being fifty cents per cubic yard.

In addition to the change of the route already mentioned, the line as originally staked along the line of the Northern Pacific right of way was approximately 195 feet from the center of the track. Certain farmers along the route claimed that the railway company owned only 100 feet from the center of its track, and were therefore objecting to the pipe line being laid on the second 150-foot strip. To avoid any controversy over the matter, and by mutual arrangement

with the railway company, for a distance of about eight miles the pipe line was changed so that it was placed approximately 90 feet from the center of the railway tracks, or within the first 100-foot strip. This change involved the crossing of what was known as Boise creek. Within a day or two after, the respondent was notified by the commissioner of light and water to proceed in accordance with their understanding to excavate Bayne cut, and on August 2, 1911, the city council passed what is known as the hardpan resolution, which provided that the commissioner of light and water should classify "all excavated material so firmly fixed in place that blasting or other great power is required to loosen the same (such material being commonly called hardpan or bounder clay mixed with stones, equally as hard to remove as hardpan) as loose rock, and that said loose rock be paid for at a price of sixteen cents above that bid for earth excavation." The resolution also provided that "loose rock excavated be measured and allowed regardless of percentage, the purpose and intent to be to pay only for the actual quantity of each and every kind of material as found by the engineer on the work; and all stones above sixty-four cubic inches in size to be included in loose rock classification." After this resolution was passed, the city's field engineers classified hardpan as loose rock, and reported the same to the city monthly until the 4th day of October, 1911, when the city council rescinded the resolution of August 2.

After the resolution was passed and before it was rescinded, the respondent let subcontracts for a part of the excavation, based upon the classification provided for in the resolution. The city's field engineers classified and measured the excavation for such subcontractors according to the classification provided for in the resolution. The respondent paid these subcontractors for the excavation done by them in accordance with the classification specified in the resolution and measured and reported by the city's field engineers. These subcontractors were paid the sum of

$9,013.67 more, based upon their classification, than they
would have been paid had their work been classified as pro-
vided for in the original contract. For the excavation of
Bayne cut, the respondent was paid, upon the basis of thirty
cents per cubic yard, $6,140.40 less than he would have
been paid had this cut been excavated under the original
contract, which specified that for earth fifty cents per cubic
yard should be paid. After the resolution was passed, pay-
ments were made by the city to the contractor under the
classification therein provided. After the resolution was re-
scinded, the excess payments were charged back to respond-
ent and compensation was only upon the classification in
the original contract.

Upon this item, the first question is whether the change
of the route around Cumberland mountain was a radical or
material change, and therefore constituted an extra for
which the respondent would be entitled to cost with ten per
cent added. As already stated, the change covered a dis-
tance of about five miles, and was at a distance from the
original line, varying from zero, where it departed there-
from and returned thereto, to a mile or more distant at the
furthermost point. The trench over this route was mater-
ially deeper than it was over the original route. Deepening
of the trench, when it goes below approximately six feet,
materially adds to the cost thereof, because in making the
cast from the ditch it is necessary to make two lifts, one
upon a platform, and then from the platform to the bank
at the side of the ditch. In the *McHugh* case, *supra*, which
arose out of a contract for the construction of another unit
of the same pipe line, it was held that changing the line
from that specified in the contract for a distance of six miles,
and from one and a half to two miles away from the original
line, materially deepening the ditch and increasing the hard-
pan excavation, was a radical or material change, and there-
fore constituted an extra. The change in the route involved
in this case was substantially as great as that in the *McHugh*

case; and it follows, therefore, that the contractor would have been entitled, for the changed route around the mountain, to the cost with ten per cent added.

The appellant claims that there was no consideration for the passage of the hardpan resolution, and that therefore the city acted within its rights in rescinding it. There is no doubt of the rule that a subsequent agreement, which does not form any part of the original contract, is of no force or validity unless supported by a new consideration. If the change of route constituted an extra, as we have already found, then the plaintiff was entitled for this to be paid the cost with ten per cent added. If his right to this was waived as a consideration for the resolution, it is obvious that the resolution was supported by a new consideration. In addition to this, the Bayne cut was excavated for a price of twenty cents per cubic yard less than the contract provided for earth excavation. It is claimed, however, that in the *McHugh* case it was held that the hardpan resolution was void. The distinction between that case and this is, that there no consideration was shown to have moved from McHugh to the city on account of the resolution. The trial court found that the resolution was the result of a good faith agreement between the contractor and the city, and that the consideration therefor was the excavation of the Bayne cut at thirty cents per cubic yard and the waiver of his right to have the changed route classified at cost with ten per cent added. It must be admitted that the testimony on this point is not harmonious, but after a careful consideration of the evidence, we are not able to say that the trial court was in error in so holding. The judgment upon this item is affirmed.

The respondent claimed $52,092.40 more for earth excavation than he had been allowed and paid by the city. Upon this item, the trial court allowed $25,700.75. The contract provided that the excavation should be paid for by the "cubic yard, excavation measurement, and the price bid for excava-

tion shall include the cost of excavation made for any purpose whatever, as well as the refilling of trenches  .  .  ."
Another provision of the contract was to the effect that the
contractor should be paid for the actual amount of the work
done.   The question therefore is, what was the total number
of cubic yards of earth excavated.   The testimony of the respondent showed a total of approximately 440,000 yards.
The testimony of the city showed a total of approximately
337,000 yards.   The monthly estimates, which were made by
the city's field engineers during the time the work was being
prosecuted, showed a total of 387,858.5 cubic yards of earth
excavation.   The testimony of the witnesses which sustained
the respective contentions of the parties was based upon theoretical calculations, aided by assumptions or interpolations
which were inharmonious.   The trial court found that the
total amount of excavation was that shown by the monthly
estimates.   This being purely a question of fact, it seems
unnecessary to review the evidence.   It is sufficient to say
that we are of the opinion that the finding of the trial court
upon this item should be sustained.

    The respondent claimed, and the trial court allowed,
$17,579.63 for the restoration of floated pipe.   Over a portion of the line, due to heavy rains and the flat condition of
the country, the trench became filled with water.   This
caused the wood pipe at places to float, and as a consequence
involved considerable expense in restoring the pipe to its
proper place.   The city claimed that the expense of restoring the floated pipe should fall upon the contractor.   The
specifications required that the trench, after the pipe was
laid, should be refilled "so as to cover the pipe to a depth
of not less than two feet unless otherwise directed by the
commissioner."   The engineers acting for the commissioner
refused to permit the respondent to back-fill to a greater
depth than one foot.   The respondent claims that a twofoot fill would have prevented the flooding.   Upon the question whether the floating of the pipe was due to the refusal

of the field engineers to permit the contractor to refill to a depth of not less than two feet, the evidence is conflicting to a high degree. The trial court found that the floating was due to the refusal of the commissioner to permit the refilling to the extent of two feet. This finding we are not disposed to disturb. We have not overlooked the fact that, in the excerpt from the specifications quoted, it is provided that the pipe shall be covered to a depth of not less than two feet, unless otherwise directed by the commissioner. While the city here reserved the right to require the contractor to proceed without refilling to the extent of two feet, the provision must receive a reasonable interpretation. An interpretation that the city might so reduce the fill that the contractor would be occasioned great loss would not seem to be a reasonable interpretation. If the floating of the pipe was caused by the fault of the engineers, as the trial court found, and as we believe is sustained by the evidence, it follows that the expense flowing therefrom should be borne by the city.

The respondent claimed $17,432.94 for extra work done where the pipe line crossed the White river. Upon this item the trial court allowed $10,810.97. The basis of the respondent's claim here is that the White river crossing was extra work for which he was entitled to cost plus ten per cent. The changes made by the city in this part of the line comprised an increase in size of the steel pipe from 36 to 46 inches for a distance of approximately 500 feet, enlarged wood pipe through the river bottom, and increased length of pipe submerged. The submerged pipe was directly under the bed of the stream, and was to be incased in concrete five feet deep and five feet across, which was widened to ten feet after the work had begun. This part of the line as altered was completed on October 20, 1911, and on November 8, 1911, the city council passed a resolution recognizing the work so changed as extra, and authorizing payment as such. However, in making payment to the contractor, the city did not allow cost plus ten per cent, as provided for in the con-

tract for extras, but paid the difference in unit price of the larger steel pipe, paid for the extra concrete at the yard price, made an allowance for yardage for extra excavation for the larger pipe, and gave a lump sum for pumping.

The city claims that the resolution allowing this work as an extra was passed without knowledge on its part as to just what had been done on this particular work, and that it was not to authorize payment as an extra at cost plus ten per cent, but to recognize the work as having been done and performed, the city officers to compute the amount due the contractor. We think the resolution recognized the work as an extra. The finding of the trial court that it was an extra should be sustained. Being an extra, the respondent was entitled to cost with ten per cent added.

The items upon which we are not in accord with the views of the trial court will now be noticed. The respondent claimed, and was allowed by the trial court, $3,010.21 more for clearing land than he had been paid by the city. For the clearing, the respondent's bid was $88 per acre. The approximate number of acres stated was 80. The contract contained this provision:

"The contractor shall be paid at the contract price for only the actual amount of material furnished and work done, regardless of the approximate quantities as stated herein."

The number of acres cleared, as shown by the monthly reports, was 157.93. When final payment was made, the city allowed for only 135.36 acres. Over portions of the right of way no clearing was necessary. The trial court allowed the total area, whether or not the contractor did any clearing. The city claims that the number of acres actually cleared was 135.36, or 34.21 acres less than the monthly estimates showed. We think that, under the contract, the contractor was entitled to the sum of $88 per acre for the amount actually cleared, and that he should be entitled to compensation for clearing 157.93 acres. Upon this item, the judgment of the trial court will be modified, and the respond-

ent will be allowed thereon the sum of $1,986.16, instead of
$3,010.21 as allowed by the trial court.

The plaintiff claimed, and the trial court allowed, $1,200
which the city had withheld because the pipe line at one place
for a distance of six or eight hundred feet had not been low-
ered to the grade called for in the specifications. When the
city made its final payment, it withheld this sum as the rea-
sonable cost of lowering to grade the section of the pipe line
mentioned. The trial court was of the opinion that the city
was not justified in so withholding this amount. From the
evidence in the record, it seems that there can be little ques-
tion but that the pipe was not at the grade established by
the specifications. The respondent seeks to justify his re-
fusal to lower the pipe on the ground that it now gives sat-
isfaction and the city evidenced no intention of lowering it
to the proper grade. The city, however, is entitled to have
the pipe line constructed as contracted for. It appears from
the evidence that the city may at any time be compelled to
lower the pipe so that it may pass at the proper depth under
a contemplated highway. One thousand two hundred dol-
lars being the reasonable cost, as shown by the evidence, of
placing the pipe at the grade fixed in the specifications, we
think the city properly deducted this amount. The judg-
ment of the trial court upon this item will be reversed.

The city contests by this appeal a number of the other
items allowed by the trial court to the contractor. These
items vary in amount from $18.40 to $1,838.36. Without
discussing them separately or in detail, it may be said that,
after giving due consideration to the objections urged
thereto by the city, we are of the opinion that the judgment
of the trial court thereon should not be modified.

One other question is presented which requires considera-
tion. The trial court included in the judgment interest
from the first day of June, 1913, that being the day upon
which the pipe line was accepted by the city. Of the amount

claimed by the respondent at that time, $71,444.84 was not in dispute, this apparently being the amount withheld by the city until the acceptance of the work.  But, as already stated, this was not paid until September 12, 1913, when $60,000 was paid, and October 5, 1913, when the balance of $11,444.84 was paid.  The trial court allowed interest on these two amounts from the date of the acceptance of the work until the respective payments were made.  On the other items, amounting to $98,042.48, the trial court likewise allowed interest from the time of the acceptance of the work until that sum should be paid.

The general rule is that interest will not be allowed upon unliquidated demands prior to the time when such demands are merged in the judgment.  This rule, however, like many general rules, has its exceptions.  *Modern Irrigation & Land Co. v. Neely,* 81 Wash. 38, 142 Pac. 458.  One of the exceptions is that interest will be allowed upon an unliquidated demand when the amount thereof can be ascertained by mere computation.  In *Parks v. Elmore,* 59 Wash. 584, 110 Pac. 381, it was said:

"The courts are not in harmony on the question, but the general rule is that interest will be allowed on an unliquidated demand, the amount of which can be ascertained by mere computation, from the time the demand accrues."

Another exception is that interest may be allowed upon an unliquidated demand where there is a reasonable standard of measurement, by the correct application of which the amount of the demand can be ascertained.  In 2 Sutherland, Damages (3d ed.), § 321, it is said:

"So if there be a reasonable standard of measurement by the correct application of which one can ascertain the amount he owes, he should equally be held responsible for making such application correctly and liable for interest if he does not."

Where, however, the demand is for something which requires evidence to establish the quantity or amount of the

thing furnished, or the value of the services rendered, interest will not be allowed prior to the judgment. In *Cox v. McLaughlin*, 76 Cal. 60, 18 Pac. 100, 9 Am. St. 164, an action was brought to recover the value of work done by the plaintiff in grading a railroad in pursuance of a contract with the defendant. Speaking upon the question of interest, it was said:

"But where, as in the case at bar, the amount of the services, their character and value, can only be established by evidence in court, or by an accord between the parties, and are not susceptible of ascertainment either by computation or by reference to market rates, or other known standard, we are of opinion plaintiff is not entitled to interest prior to verdict or judgment."

Applying these rules to the present case, we are of the opinion that, as to the $71,444.84, the trial court properly allowed interest. Upon this item there appears to have been no dispute. Evidence was not required to establish the amount thereof. As to the other items which were included in the total of $98,042.48, interest could not be allowed prior to the entry of the judgment. With possibly one exception, the items which made up this amount were in dispute, either as to the amount of work done, or the material furnished, or the price which was to be paid therefor. It being necessary to establish by evidence the amount of the services furnished, or the quantity of material supplied, and not being able to establish these either by computation or by reference to a known standard, interest prior to the date of the judgment was improperly allowed.

It is possible that interest upon the $1,200 item for lowering the pipe could be sustained; but from the view that we take of that item, it here becomes immaterial, and we express no opinion upon the question whether interest was properly allowed thereon. The respondent, to sustain the judgment of the trial court upon the allowance of interest, cites the case of *McHugh v. Tacoma*, 76 Wash. 127, 135 Pac. 1011,

together with other authorities. In that case the principal and controlling question was whether the change of route was such a change as would constitute extra work under the ordinance approved by the citizens and under the terms of the contract. The controversy in that case was not over the amount of work or the price to be paid therefor. When it was determined that the work there involved should be classified as extra, the amount of the recovery was rendered reasonably certain. The holding in that case will not sustain the right to interest in the present case upon the items making up the total of $98,042.48. Other authorities are cited by the respondent. Without reviewing these, it may be said that in none of them is the rule announced that interest may be recovered prior to verdict or judgment upon an unliquidated demand, when either the amount of the work, the material supplied, or the price to be paid, is in dispute, and must be determined by evidence, and cannot be determined by computation or by reference to a reasonably certain standard.

The cause will be remanded with direction to the superior court to modify the judgment in conformity with the views expressed in this opinion. The appellant will recover costs in this court.

Morris, C. J., Mount, Chadwick, Ellis, Fullerton, Holcomb, and Parker, JJ., concur.