[No. 30966. Department Two. January 26, 1950.]

THE LONG-BELL LUMBER COMPANY *et al.*, *Appellants*, v. THE
NATIONAL BANK OF COMMERCE OF SEATTLE *et al.*,
*Respondents and Cross-appellants.*[1]

¹Reported in 214 P. (2d) 183.

*Charles H. Paul, David E. McLean,* and *Judson T. Klingberg (Jesse Andrews, C. E. Lombardi,* and *Baine P. Kerr,* of counsel), for appellants.

*Ronald Moore (Hugh H. Barber,* of counsel), for respondents and cross-appellants.

MALLERY, J.—This is an appeal from a declaratory judgment interpreting a contract.

The plaintiff-appellants are: (1) The Long-Bell Lumber Company, hereinafter called Long-Bell, and (2) Messrs.

Morris and Goodrich, its officers, who represent Long-Bell in real-estate transactions under this contract and whom we shall call the reconstituted diking district committee or RDDCom. The defendant-cross-appellants are: (1) the protective committee for certain local improvement district bondholders, hereinafter called the LIDCom, and (2) Mr. Warrens, the managerial agent of the two committees in the real-estate transactions. The National Bank of Commerce is joined only to bind it as custodial trustee of the lands involved in the real-estate transactions.

In 1925, there was created Cowlitz County Consolidated Diking Improvement District No. 1, hereinafter called DD. It undertook diking improvements, levied assessments upon the land within the district, which encompassed the city of Longview, and issued bonds to the amount of $3,260,000. Shortly after DD was created, there were created many local improvement districts, hereinafter called LID, for the construction of improvements in the city of Longview. Improvements were undertaken, assessments levied on the land and bonds issued to the amount of $3,185,794.34.

The primary source for redemption of all these bonds was assessment of lands within DD and LID, both of which encompass roughly the same area. But this source alone was insufficient to make the bonds marketable. Since the lands were being developed by the Longview Company, hereinafter called Longview, a wholly-owned subsidiary of Long-Bell, Long-Bell guaranteed nearly all of the bonds to make them salable.

Financial difficulties overtook the districts and Long-Bell. By 77(b) proceedings under the Federal bankruptcy law, Long-Bell's liability as guarantor of the bonds was discharged and, in lieu thereof, on November 30, 1935, Long-Bell common stock was placed in two *separate* trusts, one for the benefit of DD bondholders and one for LID bondholders. By the terms of each trust, bondholders could require their respective trustee to sell the Long-Bell stock and apply the proceeds ratably to the payment of the respective bonds. In this manner, Long-Bell would be

discharged of its guaranty liability and would become subrogated to the rights of bondholders to recover from the primary obligors, the DD and LID, to the extent of the payments made from stock liquidations.

Of course, all lands subject to DD and LID assessments were subject to taxes. Tax and assessment delinquency increased, with tax liens being superior to assessment liens. Foreclosure of a tax lien extinguished the accrued assessment liens on the land in question. Upon tax lien foreclosure, Cowlitz county could, and frequently did, resell tax-foreclosed land at a price sufficient only to pay the delinquent taxes but insufficient to pay the aggregate of the delinquent taxes *and* delinquent DD and LID assessments. As foreclosures increased, the county acquired much land within the districts which, as a result of foreclosure, was freed from accrued DD and LID assessment liens. In March, 1937, there remained unpaid DD bonds in the principal amount of $2,125,500 and LID bonds in the principal amount of $1,499,500. It became distressingly apparent that DD and LID bondholders never would be repaid when so much of the source of redemption for their investment could be extinguished and was about to be extinguished in this manner. Moreover, already depressed land values in the districts, the basis for assessments, dropped sharply as soon as the market was flooded with the tax-foreclosed land.

This was the situation on August 30, 1937, when (1) the Longview Company, (2) the DDCom, and (3) the LIDCom executed the "Three Party Agreement," hereinafter called TPA, which is before us for interpretation.

All the parties were interested in stabilizing the local land values so that county tax foreclosures would prejudice them as little as possible. The committees had no funds with which to finance a scheme to salvage assessments and land values, and had no promotional talent or facilities with which to carry out such a scheme. Longview had the promotional facilities for buying, improving, and selling land, plus the interest of a large landowner.

By the terms of TPA, Longview was to advance money and furnish management for a real-estate undertaking which contemplated the inducing of bidding on land parcels at county resales so that the prices received would satisfy all the delinquent taxes *and* assessments. In this manner, since the county would transfer assessments thus collected to the DD and LID redemption funds for repayment to the bondholders, the assessments, which otherwise would have been extinguished by foreclosure, would be salvaged for the benefit of the bondholders. Longview, by the terms of the agreement, was to take its chances on recovering its advances, interest, and commission out of such moneys as resale operations could produce. The net gains, after repaying the advances and operations costs, including fees for Longview's services, were to be paid into a special fund, hereinafter called fund seventeen, and it was agreed that seventy-five per cent of this fund was to be paid to the DDCom and twenty-five per cent to the LIDCom. The agreement stipulated that bondholders who had deposited bonds with the committees in return for certificates of deposit, hereinafter called c/d's, would share the proceeds of the operation only until they had been paid the par value of their c/d's plus three per cent interest. Longview was given the right to purchase all the interest of either or both committees but the committees reserved the right to terminate its managerial agency.

TPA operations were very successful but the committees did not rely solely on fund seventeen to recover on the bonds. In 1942 and 1943, while its bonds were in default, each committee exercised its right to compel the trustee to liquidate the respective Long-Bell stock trusts. In addition to these recoveries, installments on assessments were being paid to the DD and the LID so that the c/d's received partial payments of principal and interest out of their respective bond redemption funds.

After liquidation of the trusts, Long-Bell surrendered its subrogation rights as guarantor of the bonds against the DD and the LID.

Differences eventually arose between the committees and Longview. July 31, 1944, the committees terminated Longview's agency and appointed Mr. Warrens as successor managerial agent of TPA operations. On the same day Longview was merged into Long-Bell.

October 1, 1945, Long-Bell exercised its TPA option rights and purchased DDCom's interest for $396,044.37, which wiped out the DDCom's debts and paid the balance due on its outstanding c/d's. Long-Bell appointed its own officers as RDDCom and, according to TPA's terms, commenced to recover the option price plus three per cent by participating in fund seventeen to the amount of seventy-five per cent thereof.

The main controversy is over how long Long-Bell can take seventy-five per cent of moneys coming into fund seventeen. Is it until they recover $396,044.37, the option price plus three per cent, or is it until they have recovered $1,439,988.47, the option price added to the value of the DD stock trust, plus three per cent? The trial court interpreted TPA paragraph twenty-two to mean that when Long-Bell has recovered the smaller amount it may no longer participate in fund seventeen until after the holders of LIDCom's c/d's have been fully paid.

Long-Bell's first and second assignments of error challenge the trial court's holding that it was not entitled to recover the larger amount, *viz.*, $1,439,988.47, from fund seventeen. In support of these assignments Long-Bell argues four propositions and exhaustively discusses the trial court's memorandum opinion. It contends the trial court erred because, in view of TPA's plain intrinsic language and the extrinsic facts and circumstances surrounding TPA's negotiation, it is apparent that: (1) TPA does not contemplate a radical difference in result to Longview depending solely upon whether it exercised the option *before* rather than *after* the liquidation of the DD stock trust, and (2) a basic proposition in TPA is that LIDCom should not benefit from the liquidation of the DD stock trust.

Since the trial court's interpretation of TPA (1) denies Long-Bell the right to recover from fund seventeen according to the same formula irrespective of *when* it exercised its option, and (2) permits LIDCom to benefit, by earlier participation in one hundred per cent of fund seventeen, as a result of the liquidation of the DD stock trust prior to exercise of the option, Long-Bell argues that the trial court's interpretation is unreasonable, erroneous, and repugnant to the parties' manifested intention.

The intentions of the parties as to this contention are to be drawn from the language used in TPA, § 22, which reads as follows:

"§ 22. It is hereby agreed by and between each of the three parties hereto that when and if the Company shall have exercised its option as to one but not both of the Committees, if the Company or its reconstituted Committee shall thereafter receive out of payments from assessments by the district or districts involved and/or out of the distributions made to it pursuant to paragraph 17 above an aggregate sum equal to the option price plus (3) per cent per annum thereon from the date of exercise of such option, thereafter the other Committee shall succeed to all the rights, powers, and interests of the Company or its reconstituted Committee in and to the proceeds and profits thereafter accruing hereunder, but not in or to any of the stock of The Long-Bell Lumber Company aforesaid deposited with Commerce Trust Company as security for the payment of any of the bonds held by the Committee as to which the option has been exercised, and, before surrendering any of said bonds to the other Committee, the Company, or its reconstituted Committee, shall have the right to stamp upon said bonds, and call to the attention of the Commerce Trust Company, a legend directing that any payments that would otherwise be made by Commerce Trust Company to the holders of said bonds shall be made to the Company."

We quote from page 221 of its brief the Long-Bell contention with regard to the language of this paragraph:

" * * * Now it seems to us (1) that the DD Committee as the original holder of the bonds had a lien on the Long-Bell stock: (2) that that lien would be transferred to The Longview Company when it exercised the option; that it would acquire the interest of a lien holder in the stock, and

(3) that the effect of paragraph 22 was to preserve to The Longview Company the right to the proceeds of the stock when and if it was sold under foreclosure proceedings and to see that none of those proceeds in any event went to the LID Committee. All of which means that if the stock was sold the proceeds could be disposed of in this way; and if it was not sold it would remain with The Long-Bell Lumber Company, The Longview Company's parent company."

This statement would have been sound provided the option was exercised before the liquidation of the DD stock, and it is so conceded by respondents, but Long-Bell contends that it is *still* entitled to all benefits which could have come to it by prior exercise of the option. It asks us, in effect, to redraft the contract so that, upon the happening of the events which did occur, the possible benefits to Long-Bell contingent upon the exercise of the option prior to liquidation of the DD stock would now be available to them through substitution of fund seventeen for the DD stock.

■ This contention is urged upon the ground of the unreasonableness of any other result. If reasonableness were to be gauged by hindsight, the contention would have some weight. Unfortunately for appellant, the wisdom of hindsight is not the test, as we said in *Carnation Lbr. & Shingle Co. v. Tolt Land Co.*, 103 Wash. 633, 639, 175 Pac. 331, quoted with approval in Washington Annotations to the Restatement of Contracts, § 230:

"The first and best resort in the construction of contracts is to put oneself in the place of the parties at the time the contract was executed—to look at it in prospect rather than retrospect—for, when money disputes have arisen, the perspective is apt to be clouded by the unexpected chance of gain or self interest."

TPA was made during the depression. At that time the entire proposal was highly speculative and success was far from being assured. We will not presume that the parties then foresaw World War II and that the price of the trust stock of the bankrupt Long-Bell Lumber Company, then recently reorganized, would increase in ten years from $400,000 to $1,043,000 ($20 a share to $52 a share). It is

this unforeseeable appreciation in the market price of the trust stock that caused the radical difference in results between exercise of the option *before* or *after* its liquidation.

We are satisfied that had the parties intended the result for which Long-Bell contends they would have said so in the contract. It was drawn on behalf of men of large affairs by eminent counsel after negotiations so extensive that inadvertent omission of matters intended to be included therein cannot be presumed. Moreover, at the time the option was exercised the DD stock already had been sold and the proceeds turned over to the DDCom and there was nothing left of it which could go to either of the parties hereto nor anything upon which the language referring to it could operate. Finally, the parties did not disagree as to the correctness of the option price, which was offered and accepted. It was the lesser amount. It is clear that, after Long-Bell recovers *that* sum plus three per cent, LIDCom is to receive all of fund seventeen until its c/d's are paid in full.

■ We hold that there is no ambiguity in the words "a sum equal to the option price" when those words are viewed prospectively from 1938 in the light of all the intrinsic and extrinsic evidence. This was the expressed limit fixed by paragraph twenty-two upon Longview's seventy-five per cent participation in fund seventeen.

The trial court is affirmed on this issue.

The essence of Long-Bell's third, fourth, fifth and sixth assignments of error is: (A) The trial court erred in holding that: (1) The exercise of the option by Long-Bell terminated the existence of DDCom. (2) RDDCom is an entity totally distinguishable from DDCom. (3) RDDCom is Long-Bell's representative, and, consequently, without right, title or interest under TPA, to which Long-Bell was not a party except as successor to Longview. (4) When LIDCom succeeds to one hundred per cent participation in fund seventeen, its status, in reference to TPA's real and personal property to which it so succeeds, will constitute

complete ownership of those things, subject only to Long-bell's future interest under its right ultimately to succeed to said things upon the happening of the contingencies stated in TPA § 23. (B) The trial court erred in *not* holding that: (1) Upon Long-Bell's exercise of the option, the existence of DDCom was not terminated nor interrupted but that DDCom continues to exist as RDDCom. (2) At all times since the exercise of the option RDDCom has borne the same relation to Long-Bell and to the subject matter of TPA as DDCom had borne previously to its c/d holders and should have equal rights, powers and duties with LIDCom in the management of TPA properties and assets. (3) The trust with respect to said property and assets assumed by RDDCom will continue until all TPA proceeds and profits have been fully disposed of.

Long-Bell contends that, during the period in question, RDDCom has a right to participate *jointly* with LIDCom in the control of the real-estate operations.

The final sentence of TPA § 20, describing the relationship subsequent to exercise of the option, reads:

"The Company [Longview] as such successor in interest, or the Committee as so reconstituted [RDDCom] shall thereafter have equal rights, powers, and duties with the other of the original Committees to the same extent that the two original Committees have hereunder respecting their dealings with the Company [Longview] as agent hereunder." (Brackets ours.)

Respondents particularly contend that RDDCom's right to participate in control can be no greater than DDCom's would have been. They contend that the limits on the right of DDCom to participate in control at this or a similar posture of affairs is expressly defined by TPA § 21 which gives all right, power and interest to the surviving original committee which, in this case, is LIDCom. Respondents support this conclusion with the further proposition that the trial court was correct because persons having only a future interest in personal property have narrowly limited rights to control it presently.

■ We hold that the trial court erred in deciding that RDDCom is not entitled to share control of real-estate operations during the period in which LIDCom is entitled to one hundred per cent of fund seventeen.

TPA § 21 is inapplicable to that situation. As it expressly indicates, it was written to provide for the situation which would have occurred if the corporate plaintiff had *not* exercised the option. It could not apply to the situation where the option *has been exercised.*

The last sentence of TPA § 20 is unambiguous. It means that RDDCom's interest in TPA operations are co-extensive with LIDCom's except that LIDCom is entitled to exclusive participation in fund seventeen until its obligation to its c/d holders is totally discharged, whereupon LIDCom drops out of TPA operations which, thereafter, shall be conducted exclusively by Long-Bell through RDDCom.

The application of common-law principles limiting present control of property by persons having only a future interest therein are inapplicable. They only apply in proper situations where there is *absence* of manifest inconsistent intentions. 2 Restatement of Property § 204. TPA manifests such an inconsistent intention.

Long-Bell's seventh, eighth, ninth and tenth assignments of error and LIDCom's first, second, third and fourth assignments of error are directed to the trial court's rulings on the counterclaims. We treat them together in their proper relationship in order to shorten this opinion, to better utilize fact expositions herein and to present in sequence our holdings on these related issues. Each issue relates to Longview's compensation. Several of the issues involve commissions; several *excess,* which has a special agreed meaning to the parties. *Excess* is a special additional compensation to which Longview was entitled under certain circumstances when the proceeds of sales might prove to be in excess of (1) cost of liquidating the land plus (2) the c/d holders' interest in the proceeds.

Long-Bell makes its seventh assignment of error the trial court's holding that Longview was entitled to commission

on county sales equal only to ten per cent of the amount actually received by the committees. This assignment requires interpretation of TPA's 1938 supplement § 8.

The background of this paragraph is that frequently the county would resell foreclosed land to third parties who would bid more than Longview was willing to bid. When the third party paid the county, the county would distribute the amount of delinquent assessments to the DD and LID redemption funds and, in due course, the redemption funds would pay the bondholders the proper amount of principal and interest. Since DDCom and LIDCom were the principal bondholders, they would receive most of these amounts for redistribution to their c/d holders. Under the original TPA, Longview was not entitled to commission on county sales to third parties. Consequently the committees would benefit by receiving these amounts without investing any TPA moneys and without deducting anything for Longview commission. In order to avoid TPA discord inherent in this situation, paragraph eight was included in the 1938 TPA supplement. Subsequently paragraph two of the 1939 TPA supplement reaffirmed this expression of intention.

Paragraph eight recites that it may become advantageous to the parties not to bid on foreclosures. This would cause title to tax delinquent land to remain in the county for eventual resale to third parties. It also recites that Longview's promotions in the area generally will promote county sales to third parties and that, consequently, Longview should be entitled to commissions on these sales in the same measure that it would be entitled to commissions on sales which it negotiated for the committees as provided in TPA, § 14, since much Longview energy was devoted to county sales indirectly. Then, paragraph eight declares:

". . . now therefore it is agreed that the Company shall be entitled to a commission equal to 10% of the total cash collections received by the County, City, diking or other special assessment district on any and all tax foreclosures or resales of eligible lands to any party or parties other than the Company or the Committees, similar to the commissions provided for in paragraph 14 of the Three

Party Agreement. The Company shall also be entitled to charge as an advance to the Committees any expenses incurred by it in connection with lands so sold, including salesmen's commissions as fully as it may, according to the terms of the Three Party Agreement, charge such expenses respecting lands acquired by the Committees. For the purpose of determining when such commissions have been earned cash receipts by the County, City, diking or other special assessment district, on sales of such lands may be treated as cash receipts by the Company on lands acquired by the Committees and sold for them by the Company, according to the provisions of paragraph 14 of said Three Party Agreement, except that such commissions shall not become payable to the Company until one or the other or both of the Committees has received sufficient cash traceable to proceeds of such sales by the County to cover such commissions so accrued."

 This entitles Longview to a commission on county sales irrespective of whether it negotiated or participated in making the county sale. The only condition to Longview's commission on county sales is that the committees must have received from their respective bond redemption funds an amount traceable to the sale in question at least equal to the amount of the commission before Longview is entitled to payment. The effect of the trial court's holding is that Longview's commission, instead of being computed on the total sales price paid by the third party to the county, is computed as ten per cent of that *portion* of the sales price that is actually received by the committees. The parties did not manifest such an intention.

Long-Bell, as Longview's successor, is entitled to (a) a sum equal to ten per cent of the total cash collections by Cowlitz county from tax resales to third parties, or (b) the amount traceable to such resales actually received by the committees, whichever amount is smaller. Accordingly, the trial court is reversed on this assignment.

Long-Bell's eighth assignment of error is that the trial court erred in holding that Longview was not entitled to commissions computed on the basis of sales prices swollen by advances made to the buyer for the payment of taxes and assessments falling due after the sale.

As in the previous assignment of error, TPA, § 14, provides that Longview shall be entitled to a ten per cent commission on:

" . . . The proceeds of sales of all lands acquired by the Committees pursuant hereto [TPA] and sold by or through the Company [Longview] and of the proceeds of all rentals or other income from such properties while held by the Committees . . . " (Brackets ours.)

The TPA real-estate contracts obligated purchasers at resales to pay taxes and assessments whenever they became due subsequent to execution of the contract. Paragraph four of these form contracts provided:

"If Purchaser fails to pay said taxes and assessments before delinquency as herein provided, the Owners shall have the right to pay the same and add the amount so paid to the purchase price of said property to the next monthly payment hereinabove provided to be paid by Purchaser to the Owners."

Purchasers sometimes failed to pay taxes and assessments and Longview paid them as provided in paragraph four above. Other times a portion of a tract was sold before the county segregated on the tax rolls the portion sold from the entire tract. When the purchaser failed to pay his taxes and assessments, Longview sometimes was forced by necessity or convenience to pay the taxes on the entire tract and charge the purchaser with the advance by adding the *pro tanto* amount to the contract purchase price in accordance with paragraph four above. In yet another circumstance the committees held real-estate contracts upon which personal property taxes were levied. When these contracts were sold by Longview, the purchaser paid the unpaid personal property taxes by assuming the additional amount as the purchase price. In this manner purchasers were forced to meet their own tax and assessment obligations and it was made certain that TPA operations would not be burdened by them.

In defense of the trial court's judgment, respondents contend that amounts added to purchase prices, as authorized by paragraph four of the TPA real-estate contract, are

not "proceeds of sales" described in TPA, § 14, because the addition to the contract purchase price is provided for security purposes only.

■ We do not agree with respondents or with the trial court. We hold that "proceeds of sales" in this context means moneys actually received by the committees as payments traceable from the real-estate contracts in question and that the full measure of these proceeds is the full purchase price of the contract as increased by the authorized advances for taxes and assessments because such was the intention of the parties manifested in TPA, § 14, considered in the light of paragraph four of the TPA real-estate contracts.

The ninth assignment of error is that the trial court erred in holding that, upon the accounting and settlement of the parties' claims, none of the real-estate contracts by which the *county* sold land to third parties could be considered in determining the amount of Longview's termination compensation attributable to commissions on deferred-payment contracts.

TPA, § 30, entitled either the committees or Longview to terminate their agency relationship. TPA, § 14, provided in part:

". . . Where sales are made upon deferred payments, the commission thereon shall not be deemed earned until such payments are received. If this contract is terminated before the full amount of the deferred payments on all such sales have been collected, the Company shall be entitled to receive a ten (10) per cent interest in such uncollected deferred payments and in the notes or other obligations and mortgages or other securities given by the purchasers of such lands to evidence or secure the same. In such event, the Committees shall assign and transfer to the Company notes and mortgages or other securities or evidences of obligation representing at least ten (10) per cent in face amount of all such uncollected deferred payments and at least equal in probable collectability to the average of such outstanding obligations."

■ As we have seen, TPA's 1938 supplement, § 8, and TPA's 1939 supplement, § 2, clarified the parties' intention

that Longview was entitled to commissions on county sales made while it was agent. There is no language in the contract indicating a contrary result if the agency is terminated. Reason and consistency require a construction of TPA which will deal alike with like elements. According to these standards, TPA manifests an intention, and we therefore hold, that the committees' obligation to their former agent, Longview, could have been satisfied only in one of two ways: (1) By paying to Longview or to its successor, Long-Bell, over the period of years since the agency termination, ten per cent of the cash received by them traceable to *all* sales consummated prior to termination, or (2) by assigning to Longview, on termination, choses in action of average collectibility evidencing the obligation of purchasers to the committees in an amount equal to ten per cent of *all* sales, Longview and county sales, made prior to the agency termination.

Closely related to this assignment is respondent's cross-appeal assigning as error the trial court's holding that Longview was entitled to commissions on interest collected as well as principal received by it on deferred-payment land contracts.

■ The language of the instrument is somewhat ambiguous on this point and precedents are not helpful in the interpretation of this unique contract, but the interpretation which one party, by conduct, adopted as its interpretation, and which conduct was not disputed for several years by the other party, is a weighty consideration and helpful in determining what intentions the parties manifested. The trial court is affirmed in its holding that Longview is entitled to commissions on the interest collected.

Long-Bell's tenth assignment of error is that the trial court erred in its interpretation of TPA's 1938 supplement, § 7(c), in so far as, on termination of the agency, it cut off Longview, and Long-Bell, its successor in interest, from subsequent participation in the *excess* accruing thereafter.

Paragraph seven of the 1938 TPA supplement described the manner in which resale *proceeds* received by Long-

view, *as collecting agent for the committees,* were to be distributed to the parties. Subparagraph (c) provided:

"(c) After application and distribution in accordance with the two foregoing sub-paragraphs any *excess* as received shall be apportioned and paid over one-half to the Company *in its individual capacity* and one-half to said fund described in paragraph 17." (Italics ours.)

The consequence of the trial court's holding is to cut off Longview, *in its individual capacity,* from one-half the *excess* of resale proceeds which, after termination of the agency, it would not receive *in its capacity as collecting agent for the committees.* The trial court held that the rights which Longview acquired under paragraph 7(c) were rights to which it was entitled only so long as it was agent. When the agency was terminated, so terminated the *excess* payments to the agent.

The condition expressed in that paragraph is that the moneys must be: "Proceeds when and as received *by the Company as collecting agent for the Committees.*" (Italics ours.) Moneys received by the successor agent of the committees could not be affected by paragraph seven; moneys received by Longview in any capacity other than as agent of the committees could not be affected by paragraph seven. The issue is whether the italicized words are a limitation on and a modification of the term "proceeds" or whether they are merely general words, as Long-Bell contends, descriptive of what the usual course with relation to proceeds should be.

We hold that the italicized words limit, modify and qualify all of paragraph seven and that consequently subparagraph (c) gives Longview an interest derivative from and dependent upon its status as agent, not an equity interest independent thereof. When its agency terminated, its paragraph 7(c) rights also terminated. The trial court is affirmed on this point.

Respondents' second and third assignments of error in their cross-appeal on the counterclaims are related to this issue. The two assignments may be consolidated and

phrased as follows: The trial court erred in holding that, in determining *excess* attributable to a single lot sold out of a larger land unit according to the formula of paragraph 7 of the TPA supplements, paragraph 7(a) requires that "net investment" incurred in acquiring, holding, and selling the whole unit of land, of which the lot sold was a portion, be apportioned equitably between all the lots making up the unit.

The factual background of this assignment is that Longview sometimes acquired land in a single unit which, of necessity, had to be subdivided to be made marketable. Typically, these lands were conveyed by Longview, in its individual capacity, to the committees in a single unit or were purchased from the county as a single unit at a unit price. If the unit were divided into one hundred lots, possibly five of them would have been readily salable at favorable prices. The other ninety-five lots might have been so situated that they would not have sold readily even though they had been improved at considerable expense. Eventually seventy-five of them would have been sold at prices so low that even the c/d holders would not have received the full share to which they would have been entitled according to paragraph 7(b) of the TPA supplements. The other twenty lots finally would have been determined to be unmarketable for favorable prices.

The trial court's holding would entitle Longview to participate in substantial *excess* on lots one through five. It would permit it to take its share of *excess* on each lot as it is sold, provided only that the sales price is sufficient to produce an *excess*. In this manner Longview could realize its share of *excess* from time to time as the sale of the lots progressed instead of waiting until all of the lots in the unit were sold. This holding would permit Longview to participate in *excess* on single lots in spite of the fact that there would be no *excess* at all, when proceeds from the sales of the entire land unit were reduced by the total "net investment" on the entire land unit.

Respondents' contention reduces the possibility of *excess* on sales of single lots comprising a land unit acquisition and would deprive Longview of any *excess* on the entire land unit acquisition until the last single lot of the remaining twenty unsold lots is sold. Moreover, respondents would permit Longview no *excess* if the total sales price of all the individual lots in the land unit less the total of the items deductible failed to yield an *excess* on the whole unit.

The words in issue are those in TPA's 1939 supplement, § 7:

". . . Whenever any lot, tract or parcel of *land acquired by the Committees* is hereafter sold, the proceeds when and as received by the Company, as collecting agent for the Committees, shall be used, applied and apportioned in the following order and for the following purposes." (Italics ours.)

Subparagraph (a) requires:

"(a) The first moneys received as such proceeds shall be used to reimburse the fund described in said Paragraph 17 to the extent of its net investment *in the respective lot, tract or parcel.* . . ." (Italics ours.)

Throughout the balance of paragraph seven the important time element is *when the individual lot is sold.* Nothing is said about the significance of the selling of the *last* unsold individual lot in the land unit acquired by the committees. We infer therefrom that the selling of the *last* unsold lot in the entire land unit acquired by the committees is not a prerequisite to Longview's participation in the *excess* from a particular lot. The words "acquired by the Committees" modify the word "land," not the words "lot, tract or parcel," and simply describe *what* land, as a class, is referred to in the paragraph.

We hold that the trial court did not err on this issue and that the judgment, as it related to these two assignments of error on the cross-appeal, is affirmed.

Long-Bell's final assignment of error is that the trial court erred in holding that LIDCom attorneys' fees and their expenses in this litigation were debts within the meaning of

TPA, § 23, subject only to the condition that their reasonableness be approved by the court.

Section 15 of the LID bondholders' protective agreement grants LIDCom the following power:

"Section 15. The Committee shall have power to employ such depositaries, *counsel, attorneys,* agents, secretaries, clerks or employees as in its opinion shall be necessary, useful or convenient." (Italics ours.)

By TPA, § 26, each committee secured from the other parties written acknowledgment of receipt of its bondholders' protective agreement and a statement that *"the limitation on the powers* of the Committees as evidenced by said agreements" and *"the expense obligation of the Committees"* were "hereby acknowledged and approved." (Italics ours.)

■ TPA incorporated section 15 of the LID bondholders' protective agreement and, by granting LIDCom the power to hire attorneys, it created a *contingent expense liability* of which Longview was given ample notice and which it approved by its execution of TPA. Long-Bell, having brought this litigation upon TPA operations, cannot now contend that LIDCom, in the proper performance of fiduciary duties to its c/d holders, is not justified in defending the action.

The trial court is affirmed on the main controversy and in all things except as specifically reversed in this opinion. It will enter judgment accordingly. Neither party will recover its costs on this appeal.

ROBINSON, HILL, and HAMLEY, JJ., concur.

SIMPSON, C. J. (dissenting in part)—In my opinion, the judgment of the trial court should be affirmed.