[No. 32414. Department Two. August 12, 1954.]

MALL TOOL COMPANY, *Appellant,* v. FAR WEST EQUIPMENT COMPANY, *Respondent and Cross-appellant.*[1]

[1]Reported in 273 P. (2d) 652.

*Witherspoon, Witherspoon & Kelley,* for appellant.

*Ennis & Herman,* for respondent and cross-appellant.

HILL, J.—This started as an action on an open account for goods, wares, and merchandise sold and delivered, but the cross-complaint raised the issue of damages for the violation of an exclusive distributorship contract.

Far West Equipment Company, a corporation, hereinafter referred to as Far West, became the exclusive sales

agent and distributor for chain saws manufactured by the Mall Tool Company, a corporation, hereinafter referred to as Mall, in certain "protected" territory which was changed in extent from time to time. (By "protected" is meant that Far West would receive credit for any sales made in that area, regardless of who made them.)

It is conceded that Far West owes Mall $23,730.94 for chain saws and other equipment sold and delivered to it, and the major controversy centers around the amount to which Far West is entitled as commissions or discounts on sales of chain saws and parts made by Mall in Far West's protected territory, either directly or through other distributors. The trial court found that Far West is entitled to $19,765.85 on its cross-complaint, thereby reducing Mall's net recovery to $3,965.09. Mall appeals, contending that Far West is not entitled to any commissions or discounts on sales made in its protected territory through Montgomery Ward & Company after August 1, 1947, and that Far West had no protected territory after March 1, 1948; and Far West cross-appeals, contending that it is entitled to discounts or commissions which were disallowed on certain Canadian sales.

■ It may seem to Mall that in the foregoing statement we have disregarded or somewhat cavalierly treated its first four assignments of error, which present its contention that there was no contract between the parties because their agreement lacked mutuality and was unenforcible except in its contemplation of a series of independent, executory transactions, consisting of separate sales of saws by Mall to Far West. While we recognize the importance of the questions presented and the ability and earnestness with which they have been argued, we agree with the trial court that our decision in *Sargent v. Drew-English, Inc.,* 12 Wn. (2d) 320, 121 P. (2d) 373 (1942), is controlling on the question presented by those assignments of error. See, also, *Federal Iron & Brass Bed Co. v. Hock,* 42 Wash. 668, 85 Pac. 418 (1906). Any extended quotation from those cases or discussion of those assignments of error would be unnecessarily repetitious.

■ We agree with the trial court that Far West had a protected territory agreement which was subject to termination by Mall "within thirty days after notice if we see fit." So far as the discounts or commissions to which Far West may be entitled in consequence of this agreement are concerned, the determinative questions relate to the date of its termination and whether it was modified prior to its termination with reference to sales made by Montgomery Ward. The trial court found that no notice of termination was given

" . . . as concerns the portion of the said protected territory lying within the United States of America prior to March 1, 1948, the date . . . [Mall] commenced this action."

Commissions of twenty-five per cent were allowed Far West by the trial court on all chain saw sales made by Mall in the territory within the United States covered by the agreement of the parties, to and including March 31, 1948 (thirty days after commencement of this action). Mall's assignments of error are insufficient to challenge the trial court's finding that no notice of termination of the contract was given until March 1, 1948, the date on which this action was commenced.

■ Mall insists that, in any event, the evidence establishes a modification by the terms of which Mall chain saws were to be sold within Far West's protected territory (and, in fact, all over the United States) by Montgomery Ward beginning August 1, 1947. With this we agree, but with recognition of an additional provision of the modification proposal, to the effect that Far West would be given what is referred to throughout the testimony as an "override" of five per cent on all sales made by Montgomery Ward in Far West's protected territory.

■ The agreement being terminable at will, Mall could at any time propose a modification thereof as a condition of its continuance. *Flint v. Youngstown Sheet & Tube Co.*, 143 F. (2d) 923 (1944); *Swalley v. Addressograph Multigraph Corp.*, 158 F. (2d) 51 (1946). When a modification

was proposed (to use a more euphemistic expression than the realistic "announced") by Mall, Far West had the choice of accepting the modification or refusing to accept it, knowing that refusal would mean the termination of its exclusive distributorship agreement.

■ Far West asserts that it never agreed to the modification whereby Mall chain saws were to be sold in its protected territory by Montgomery Ward, with Far West receiving a five per cent override on such sales. A letter by Far West dated June 27, 1947, indisputably establishes that it had notice prior to that date of Mall's intention to so modify the agreement effective as of August 1, 1947, and that Far West's concern was to get an agreement in writing, if possible, confirming the modification, with some assurance as to how long the five per cent override would continue. We can agree that Far West was never happy about the modification, but it never refused to accept it, and it is our view that there was a reluctant acquiescence.

Whether Far West would have acquiesced in such a modification without the five per cent override, we do not have to determine unless the agreement was further modified by the elimination of the override on the Montgomery Ward sales. On this point we conclude, contrary to Mall's contention, that no definite and final notice that the override agreement was to be withdrawn was given Far West prior to the commencement of this action on March 1, 1948. Mall insists that a letter of August 23, 1947, was notification of the termination of any exclusive distributorship, and notice that "there will be no over-ride credit on sales not made directly by yourself." This letter does not purport specifically to eliminate the Montgomery Ward override, but refers to all overrides.

■ Mall's contention may be precluded by the finding of the trial court that no notice of termination was given prior to March 1, 1948. In any event, we are satisfied that the letter is not unequivocal in wording when considered as a whole. The testimony is that, in consequence of an immediate protest by telephone to Mall's sales department, Far

West was advised to disregard the letter, and that the Mall management decided to "let it lay for a bit." Nor is that letter consistent with Mall's pleadings, wherein it is alleged that "finally on or about January 30, 1948," Mall and Far West terminated their agreement. While we cannot agree that anything that happened "on or about January 30, 1948," either terminated the agreement or constituted notice of intent to terminate, this allegation does indicate that Mall did not regard the letter of August 23, 1947, as such termination. A letter dated September 29, 1947, from the Mall sales department, also negatives any intent to terminate the agreement and indicates that whether Far West was to receive the override on sales made by Montgomery Ward was still an open question, and we find nothing in the record which closed it prior to the commencement of this litigation.

In the absence of notice to Far West of a definite withdrawal of the five per cent override on the Montgomery Ward sales in its protected territory, Mall was bound by its modification as originally proposed, for, limited as Far West's choices were in the matter of proposed modifications, it at least had a right to know what they were.

Montgomery Ward sales subsequent to August 1, 1947, and prior to March 31, 1948, amounted to $46,454.03. Other sales by Mall in the protected territory prior to March 31, 1948, amounted to $32,609.38. The trial court allowed Far West $19,765.85, or twenty-five per cent of the total of the two amounts, as damages for the sales made in its protected territory.

■■■ Mall urges that the damages awarded to Far West are speculative, because Far West failed to prove the expenses which would have been incurred to produce the sales for which commissions are claimed. We do not think that the general rule governing proof of damages resulting from breach of contract, and the authorities which Mall cites, are applicable to a consideration of the amount which Far West is entitled to recover for sales wrongfully made within its protected territory. The trial court found that

*by the terms of its contract* with Mall, Far West was entitled to a twenty-five per cent commission or discount on all Mall chain saws and chain saw parts sold in the protected territory. The conduct of the parties over the period of time that the contract was in force is consistent with and supports such a finding. In particular, Mr. Sanders, of Mall, testified that the business term "protected territory" meant that Mall could not make sales in that territory without some further agreement with the exclusive distributor; that generally in such a case it is agreed that the exclusive distributor will be paid a five per cent or ten per cent override, but that:

"An override credit can also mean the full amount. If we sold it, and the customer paid the full price and didn't get any override, it might mean the full 25%. . . ."

In other words, so far as Mall was concerned, it was accountable for a twenty-five per cent discount on every sale made within the protected territory. In this connection, it might make a special agreement with the exclusive distributor whereby sales would be made through another dealer and the twenty-five per cent discount split between the two, the former receiving a five or ten per cent override and the latter receiving credit for the remainder of the discount. However, if the sale was made by Mall directly from the factory to a customer who paid the full list price, or through another dealer in the absence of such an agreement with the exclusive distributor, the latter would be entitled to a credit for the full twenty-five per cent discount on the list price of the saw.

Mr. Soderberg, also of Mall at the time with which we are here concerned, testified to the same effect as to Mall's interpretation of an exclusive distributor's rights under a protected territory agreement:

"A. Once in a while an order would be received by the Mall Tool Company with a check, in some cases, for a saw, to be shipped to a certain territory. We would accept that check and ship the saw, and credit the full 25% commission to the dealer's account. . . . Q. Did that situation exist subsequent to August 23rd, 1947? A. Yes. Q. And the

reason for that—. . . . A. Because that territory would be allocated or given to the Far West Equipment Company."

It is apparent, then, that Mall's interpretation of the meaning of the term "protected territory" was the same as that found by the trial court, *i. e.*, that, in the absence of a special agreement, Far West was entitled to credits of twenty-five per cent on all sales made within its protected territory, whoever may have made the sales or have been the procuring cause thereof.

Where there is doubt as to the meaning of a term in a contract, courts generally will give it the construction placed upon it by the parties thereto, especially when they have acted under it for a great length of time. *State ex rel. South Bend v. Mountain Spring Co.*, 56 Wash. 176, 184, 105 Pac. 243 (1909); *Long-Bell Lbr. Co. v. National Bank of Commerce*, 35 Wn. (2d) 522, 537, 214 P. (2d) 183 (1950); *Toulouse v. New York Life Ins. Co.*, 40 Wn. (2d) 538, 541, 245 P. (2d) 205 (1952).

It follows that, upon proof of sales by Mall (other than through Montgomery Ward) in the amount of $32,609.38 within Far West's protected territory, Far West, under the terms of the contract, was properly allowed recovery of a twenty-five per cent commission or discount thereon, amounting to $8,152.35. On the Montgomery Ward sales of $46,454.03, Far West is entitled to only the five per cent override or commission, amounting to $2,322.70, rather than the twenty-five per cent allowed by the trial court. The judgment in favor of Far West on the cross-complaint should be $10,475.05 instead of the $19,765.85 allowed by the trial court.

Far West has cross-appealed from the portion of the judgment dismissing its cause of action based upon what are referred to as the Canadian claims. The factual background for the cross-appeal is that on February 21, 1946, Mall enlarged the protected territory in which Far West had the exclusive distributorship for Mall chain saws to include the Canadian provinces of British Columbia and Alberta. On the same date, Far West made Bingham &

Hobbs Equipment Co., Ltd., hereinafter called Bingham & Hobbs, its agent for distribution of Mall chain saws in the Canadian territory. Under this arrangement, Bingham & Hobbs was allowed a twenty per cent discount or commission on all chain saws and parts it sold in the two provinces and Far West retained the other five per cent. On March 20, 1946, Far West received an order from Bingham & Hobbs for five hundred chain saws. This order, however, was not a firm order; as Bingham & Hobbs sold chain saws and forwarded the orders, they were credited to the 500-saw order.

Effective July 1, 1946, a change was made in the handling of orders from Bingham & Hobbs. Prior to that date, Mall directed Bingham & Hobbs "to cancel all your orders you now have open with Far West and send orders to us covering your requirements in saws." A copy of this directive went to Far West, and pursuant thereto Bingham & Hobbs canceled its outstanding orders with Far West as of July 1, 1946, and on July 2, 1946, submitted an order for five hundred chain saws direct to Mall. Thereafter, instead of going through Far West as theretofore, Bingham & Hobbs' orders and shipments were handled direct; however, until February 1, 1947, Far West continued to receive its five per cent commissions on all orders received by Mall from Bingham & Hobbs. During that time Mall shipped 230 saws to Bingham & Hobbs against its 500-saw order.

On December 28, 1946, Mall wrote Far West giving notice that, effective January 1, 1947, Far West would no longer be its distributor in British Columbia and Alberta and no commissions would be paid to Far West on Canadian orders shipped after that date. Far West immediately protested that it was entitled, by the terms of its contract, to thirty days' notice of termination. Mall recognized the right to such notice and made the termination of Far West's distributorship in the Canadian territory effective as of January 31, 1947. Between February 1, 1947, and December of that year, Mall made no shipments of saws to Bingham & Hobbs.

Far West now claims that, having procured a 500-saw order which had not been canceled at the time of the termi-

nation of its Canadian distributorship on January 31, 1947, it was entitled to a five per cent commission on all saws sold and delivered to Bingham & Hobbs subsequent to that date until the 500-saw order was filled. The trial court found:

"That subsequent to February 1, 1947, . . . [Mall] did not fill any Canadian orders for Mall chain saws and/or chain saw parts that had been obtained by . . . [Far West] prior to the date of cancellation . . . [of Far West's rights in the Canadian territory]."

The evidence indicates that the 500-saw orders were a device used by dealers in a period of short supply to indicate what their needs might be and to establish a basis on which Mall could allocate its limited production. Such orders were not regarded as firm orders, and shipments were not made nor discounts or commissions credited until firm orders were received. We agree with the trial court that the 500-saw order was not an order on which Far West was entitled to receive a discount or commission.

However, there is yet another ground on which the portion of the judgment from which Far West appeals could be affirmed, and that is estoppel. The letter of December 28, 1946, giving notice to Far West of the withdrawal of the Canadian territory, contained the following language:

"For some time now we have felt distributing Mall chain saws in the Canadian market through your company has not been a satisfactory arrangement and *have decided to sell Bingham & Hobbs direct on our regular protected jobber discount.* . . .

"We feel that you have been adequately compensated for the groundwork that you have done in establishing Bingham & Hobbs as our Canadian outlet in British Columbia and Alberta. All orders shipped to Bingham & Hobbs after January 1st will be billed to them direct and *no commission will be payable to you.* This will in no way disrupt your territory in the United States which will remain the same." (Italics ours.)

Far West was thus clearly notified that Mall was granting the Canadian territory to Bingham & Hobbs on a protected basis at the regular twenty-five per cent discount,

and that Far West would receive no commissions on shipments subsequently made to Bingham & Hobbs.

Far West made no written protest other than to request thirty days' notice of withdrawal of the territory, to which Mall agreed. Mr. Johnson of Far West testified that he "complained" to representatives of the sales department on several occasions, but did not write to Mall on the subject. When Far West stood by while Mall was paying a twenty-five per cent commission to Bingham & Hobbs, which included the five per cent to which Far West claims it was entitled, without an unequivocal statement of its position, it waived any rights it might have had in connection with shipments subsequent to January 31, 1947, and is now estopped from asserting a claim for commissions on sales subsequent to that date. See *Cohen v. Robinson*, 119 Wash. 392, 205 Pac. 838 (1922); *Lloyd v. Midwest Fuel Co.*, 97 Ind. App. 322, 179 N. E. 583 (1932).

The portion of the judgment from which Far West cross-appeals is affirmed.

There remains one assignment of error by Mall which must be considered at some length, namely, that the trial court erred in failing to allow interest on the $23,730.94 found due from Far West on the open account for goods sold and delivered from February 19, 1948, the date of the last item thereof.

Apart from the question of the effect of Far West's claim for damages for the breach of its exclusive distributorship agreement in its protected territory, consideration of which we reserve for later discussion, we are satisfied that Mall is correct in its contention that it is entitled to interest on the balance found to be due it from February 19, 1948. The authorities are in general agreement that, when an amount claimed is "liquidated" or when the amount of an "unliquidated" claim is ascertainable by computation, interest is allowed as damages for the withholding of the amount due. *Parks v. Elmore*, 59 Wash. 584, 110 Pac. 381 (1910); *Herman v. Golden Arrow Dairy*, 191 Wash. 582, 71 P. (2d) 581 (1937); McCormick on Damages 213, § 54; 1 Sutherland on Damages (4th ed.) 1004, 1030, §§ 320, 329.

■■■ While this court, in common with others, has had difficulty with its definition of the term "liquidated," we are persuaded that a suit to recover the amount due for goods sold and delivered at an agreed price is an action on a liquidated claim or demand. The fact that a defendant may contend and establish that he did not receive certain of the items, or that he was not given certain credits to which he is entitled, does not change the status of the claim in so far as the right to interest is concerned.

The use of the words "liquidated" and "unliquidated" is avoided in the statement of the rule as to when interest is recoverable as damages for the breach of a contract in Restatement, Contracts, § 337 (a), which reads as follows:

"If the parties have not by contract determined otherwise, simple interest at the statutory legal rate is recoverable as damages for breach of contract as follows:

"(a) Where the defendant commits a breach of a contract to pay a definite sum of money, or to render a performance the value of which in money is stated in the contract or is ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices of the subject matter, interest is allowed on the amount of the debt or money value from the time performance was due, *after making all the deductions to which the defendant may be entitled.*" (Italics ours.)

McCormick on Damages 213, § 54, defines "liquidated" as follows:

"A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion. Examples are claims upon promises to pay a fixed sum, claims for money had and received, claims for money paid out, and claims for goods or services to be paid for at an agreed rate.

"If the claim is one of the kinds mentioned above, it is still 'liquidated,' by what seems the preferable view, even though it is disputed in whole or in part."

In his discussion of this definition, McCormick says:

"Doubtless all courts would agree that a specific sum of money named in and covenanted to be paid by an express contract, where the liability to pay the principal sum is

undisputed, is a 'liquidated' sum. Such admitted claims rarely give rise to any controversy over interest. Is the claim for such a sum still a 'liquidated' demand, where the defendant denies all liability under the contract, or disputes liability for certain items and admits others? It would seem that the existence of a dispute over the whole or part of the claim should not change the character of the claim from one for a liquidated, to one for an unliquidated, sum, and this conclusion finds support in the cases. . . .

"In short, it is the character of the claim and not of the defense that is determinative of the question whether an amount of money sued for is a 'liquidated sum.' "

McCormick points out, however, that in some decisions it has been held that if a defendant in good faith denies liability for all or part of a claim, the claim thereby becomes unliquidated and interest cannot be charged thereon prior to judgment. It is Far West's contention that this court has heretofore taken that position.

The very statement of the present case emphasizes how manifestly unjust and unreasonable such a rule would be. For chain saws and parts sold and delivered at an agreed price by Mall to Far West, the former sues the latter for $24,474.33. Far West concedes that $23,369.40 is due, but claims that it did not receive certain shipments and is entitled to certain credits, and denies liability as to $903.93 of the amount sued for. (The trial court found that three items of an agreed value had not been delivered to Far West, and that it was entitled to a two per cent discount on one item in accordance with the credit terms of their agreement. The court accordingly reduced the amount sued for by $743.39.) The total amount of the claim less deductions could be and was ascertained by computation with exactness, without reliance upon "opinion or discretion."

An extensive but not exhaustive review of our cases on the allowance of interest in contract actions does not reveal any cases involving the amount due for goods sold and delivered at an agreed price or where "the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion

or discretion," in which we have refused to allow interest prior to judgment. The question of interest usually is dealt with very briefly in a short paragraph at the end of the opinion; hence it is not always possible to tell whether interest was allowed because we considered that the claim was liquidated or because, even if unliquidated, the amount of the claim could be ascertained by mere computation. In either case, interest is allowed from the date payment becomes due.

Our cases allowing interest prior to judgment on contracts for goods sold and delivered include: *Dickinson Fire & Pressed Brick Co. v. Crowe & Co.,* 63 Wash. 550, 115 Pac. 1087 (1911); *Royal Dairy Products Co. v. Spokane Dairy Products Co.,* 129 Wash. 424, 225 Pac. 412 (1924); *A. W. Hartman Shoe Co. v. Hanson,* 135 Wash. 512, 238 Pac. 17 (1925).

There are numerous cases on contracts for the payment of money in which we have allowed interest prior to judgment, where the amount due was determinable by computation. They include: *Parks v. Elmore,* 59 Wash. 584, 110 Pac. 381 (1910); *Empire State Surety Co. v. Moran Brothers Co.,* 71 Wash. 171, 127 Pac. 1104 (1912); *McHugh v. Tacoma,* 76 Wash. 127, 135 Pac. 1011 (1913); *Modern Irr. & Land Co. v. Neely,* 81 Wash. 38, 142 Pac. 458 (1914); *Hudnall v. Pennington & Co.,* 136 Wash. 155, 239 Pac. 2 (1925); *Barbo v. Norris,* 138 Wash. 627, 245 Pac. 414 (1926); *Woodbridge v. Johnson,* 187 Wash. 191, 59 P. (2d) 1135 (1936).

*A. W. Hartman Shoe Co. v. Hanson, supra,* was an action similar to that instituted by Mall in the instant case. Recovery was sought by respondent of a balance of $449.06 alleged to be due on an account for the sale and delivery of goods, wares, and merchandise. It was admitted that goods, wares, and merchandise of the agreed value were delivered to appellant, but there existed a sharp dispute as to a claimed credit for payment on the balance due. The trial court resolved the factual dispute and allowed judgment of $422.16 with interest from the date of the last item. This judgment and award of interest was affirmed on appeal.

In *Ryan v. Plath,* 20 Wn. (2d) 663, 148 P. (2d) 946 (1944), interest prior to judgment was disallowed. This was an action against the administrator of an estate for an accounting of the proceeds of the apple crop taken from the estate. The *Hartman Shoe Co.* case, *supra,* was distinguished on the basis that:

"Here . . . certain items of the account were controverted, and the claim could not have been, and was not, liquidated until proof was taken and the account approved by the trial court."

Upon analysis, it appears that the distinction which we attempted to make in the *Ryan* case, *supra,* was not based strictly upon the fact that there existed a dispute as to the balance of the account which required the taking of proof, as these elements existed also in the *Hartman Shoe Co.* case. Rather, the distinction lies in the nature of the account and the manner in which the balance is to be determined. In the *Ryan* case, the balance found to be due on the administrator's account could not be determined with reference to a fixed standard of measurement, but depended upon approval by the court of the manner of disposal of the apple crop, including the allowance of reasonable compensation for the administrator's services.

A somewhat similar situation was presented in *Fiorito v. Goerig,* 27 Wn. (2d) 615, 179 P. (2d) 316 (1947). That case involved an accounting between the members of a joint venture. Interest prior to judgment was disallowed where the joint adventurers were in hopeless disagreement about nearly every item in the account and nothing could be done "except to submit the matter to the court to determine whether any sum was due appellants or whether they had been overpaid."

This distinction is further indicated in *Modern Irr. & Land Co. v. Neely, supra,* which was an action by owners of lands against their real-estate brokers for an accounting of the receipts of earnest moneys in connection with sales of land. Interest was allowed on quarterly balances as established by the accounting. Judge Ellis, speaking for this court, said:

"It is true, of course, that, as a general rule, interest is not allowed upon unliquidated demands. *This rule, however, like nearly all general rules, has its exceptions. Courts will not hesitate to make it yield to the equities of a given case.*" (Italics ours.)

It was there held that the means of determining the balances were always at hand, and that:

". . . where the balance at any given period throughout the running of the contract was capable of ready ascertainment by mere computation, the old common law rule has been much relaxed. In such cases, authority is not wanting that the demand should be treated as liquidated from the time when its certainty was so simply determinable."

Far West cites *Meyer v. Strom*, 37 Wn. (2d) 818, 226 P. (2d) 218 (1951), as authority for holding that Mall's claim against Far West is unliquidated. We there pointed out, concerning one of the substantial items in the claim (for rental of well drilling equipment) which we were urged to hold was liquidated, that:

"The matters of the rent for drilling the Erickson well, the casing used in that well, and the hourly rental rate were all in dispute, in addition to Strom's counterclaim involving the Karr well."

The Strom counterclaim may have been of the character hereinafter referred to as constituting a proper reduction of a liquidated claim for the purpose of determining the balance which is to draw interest. In any event, we can agree that it may not have been possible in that case, even after resolving the factual disputes, to compute the amount due with reference to a determinable standard of measurement without reliance upon "opinion or discretion."

Such confusion as may exist in our cases is attributable, in part at least, to misapplication of a frequently quoted statement made in *Wright v. Tacoma*, 87 Wash. 334, 151 Pac. 837 (1915), where, after pointing out that interest will be allowed on an unliquidated demand where there is a reasonable standard of measurement by the correct application of which the demand can be ascertained, we said:

"Where, however, the demand is for something which requires evidence to establish the quantity or amount of the thing furnished, or the value of the services rendered, interest will not be allowed prior to the judgment."

This language, taken out of context, is too broad if applied to quantity or amount where there has been a sale at a fixed price per unit. The *Wright* case, *supra,* approves *Parks v. Elmore, supra,* where the judgment was based upon evidence that 15,500 dog salmon had been caught for which the agreed price was ten cents per fish. In the *Wright* case, which involved certain claimed extras in connection with a contract for construction of a pipe line, we described the situation before the court by saying that, with possibly one exception, the items involved were in dispute either as to the amount of work done or the material furnished or the price which was to be paid therefor, and said: ·

"It being necessary to establish by evidence the amount of the services furnished, or the quantity of material supplied, and *not being able to establish these either by computation or by reference to a known standard,* interest prior to the date of the judgment was improperly allowed." (Italics ours.)

Our case of *Lloyd v. American Can Co.,* 128 Wash. 298, 222 Pac. 876 (1924), illustrates the proper test for determining whether an amount due is ascertainable by computation. This was an action for breach of a contract to furnish certain appliances for resale. One item of damage was for money advanced in the form of the purchase of credit notes. The credits were, in effect, an advance payment of two dollars each on the purchase price of fifty-five hundred appliances and were to be applied to the cost of the appliances as they were delivered, but only eight appliances were delivered before the contract was breached. We pointed out that the value of the unused credit notes could be easily computed and the amount of damages readily ascertained, and held that interest should be allowed thereon from the date the contract was breached. We disallowed interest prior to judgment on another item of damage, for twenty-five hundred dollars for loss of time in preparing to perform the

contract, because that amount could be arrived at only on testimony as to the competency, experience, and earning ability of the plaintiff. Interest was also disallowed on $2,101.15 which represented money paid out in preparing to perform the contract. Of this item, we said:

"While it is true that the amount of this expenditure was, or could easily have been made, definite and certain, yet the respondent was not entitled to recover it simply because he had expended it but only in the event the expenditure was reasonably necessary for the purpose. As to what items and amounts would be reasonably necessary, was a matter which only a court or jury could determine. There would not be any way of computing it in advance, nor could it be computed by any reasonable standard of measurement."

In that case, we applied the rule that, if there be a reasonably certain standard of measurement by the correct application of which one could ascertain the amount he owes, interest should run on an unliquidated claim.

 We come now to a summary of our discussion relative to Mall's right to interest on the amount found to be due on its claim for goods sold and delivered at an agreed price (still excluding consideration of Far West's claim for damages on its cross-complaint). While we are disposed to adopt McCormick's definition of a liquidated claim, and to hold that Mall is entitled to interest because its claim is liquidated, it is not necessary to so hold and we content ourselves with holding that Mall is entitled to interest on its claim, even if it be regarded as unliquidated, because *the claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance upon opinion or discretion.*

(To avoid repetition, a claim of the character described in the language just italicized will be hereinafter referred to as a determinable claim, and when we refer to an unliquidated claim, we will mean one where the amount due is not determinable by computation in the manner described in the italicized portion of the sentence above.)

We turn now to that element which we have thus far

excluded in our consideration of Mall's right to interest, *i.e.*, Far West's claim for damages on its cross-complaint in consequence of sales made in its protected territory. Far West has made no contention that it is entitled to interest on the amount awarded it as a commission on each of such sales; hence we are not concerned with Far West's right to interest prior to judgment on the amount of its counterclaim as a separate and distinct item, but only with the effect of such a counterclaim on Mall's right to recover interest prior to judgment on its claim for the amount due it for goods sold and delivered.

An unliquidated counterclaim, even when established, does not affect the right to interest prior to judgment on the amount found to be due on a liquidated or determinable claim, since the debtor may not defeat the creditor's right to interest on such a claim by setting up an unliquidated claim as a set-off. *Hansen v. Covell*, 218 Cal. 622, 24 P. (2d) 772, 89 A. L. R. 670 (1933). (If the counterclaim or set-off be liquidated or determinable, such claim could bear interest in its own right from the time it or the various items which comprise it become due and payable.)

There is a rule, however, applicable under certain circumstances, that the amount found to be due on a liquidated or determinable claim may be reduced by the amount found to be due on an unliquidated counterclaim or set-off, and that interest will be allowable only on the balance remaining after the reduction has been made. This rule is applicable only when the amount to which a defendant is entitled as a counterclaim or set-off is for defective workmanship or other defective performance by the plaintiff, of the contract on which his liquidated or determinable claim is based, of a character such that the award of damages as compensation is regarded as constituting either a reduction of the amount due the plaintiff or a payment to him. This is on the theory that the plaintiff is entitled to interest only on the amount of which he has been deprived of the use during the period of default. *Hansen v. Covell*, *supra*; 15 Am. Jur. 584, Damages, § 167; see annotations,

3 A. L. R. 809, 89 A. L. R. 678. These principles are supported by our cases of *Dickinson Fire & Pressed Brick Co. v. Crowe & Co., supra,* and *Barbo v. Norris, supra.*

In the *Dickinson* case, *supra,* the suit was to recover the balance due on a quantity of brick sold to a contractor for use in the construction of a certain building. As damages for failure of some of the brick to conform to the agreed quality and size, the trial court allowed a set-off of fifteen dollars a thousand on seven thousand brick and one hundred dollars for the expense of cleaning and sorting rejected brick, and entered a judgment for the balance due on the purchase price, with interest from the time the demand accrued until judgment was entered. Discussing the matter of interest, we said:

"It is finally said that the court erred in allowing interest prior to the date of the entry of the judgment. There is nothing in the record to indicate that the parties did not contemplate a cash sale. The purchase price was agreed upon prior to the date of the first shipment. Interest is allowable on a liability to pay money from the time the demand accrues, where the amount can be ascertained by computation. *Parks v. Elmore,* 59 Wash. 584, 110 Pac. 381. The existence of a set-off or counterclaim, which is unliquidated, will not prevent the recovery of interest on the balance of the demand found due from the date of its maturity."

In the *Barbo* case, *supra,* a subcontractor sued for the balance of the amount due on a contract for grading and grubbing and for culvert construction in connection with the building of a railroad. The trial court deducted from the $5,440.57 computed and found to be due under the terms of the contract, an unliquidated item of $360 for failure to burn stumps and debris on the right of way, and allowed interest prior to the judgment on the balance of $5,080.57. This court there said:

"The amount due respondents was ascertained by mere computation in which case interest is always allowable from the time the account accrued."

In the instant case, if Far West were claiming that defective workmanship in the saws made them unsaleable

or reduced their value, or resulted in a need for repairs to make them saleable or in other damage, we would have a basis for the application of the above rule. But Mall's breach of its exclusive distributorship contract with Far West involved a separate (bilateral) feature of the contract and had nothing directly to do with the sale of goods, wares, and merchandise to Far West or the amount due therefor. The damages to which Far West is entitled for sales made in its protected territory would reduce the amount of the judgment which Mall is entitled to recover in this action, but those damages would not in any way affect Mall's right to interest prior to judgment on its claim for goods sold and delivered at an agreed price.

However, the interest prior to judgment should run only until March 15, 1951, because the judgment could have been entered on that date, the court having determined all the major issues, including Far West's right to damages for the invasion of its protected territory. The delay to June 12, 1952, was for the purpose of obtaining a satisfactory accounting from Mall of sales made in Far West's protected territory. Mall, being responsible for the delay, cannot claim interest between March 15, 1951, and the entry of the judgment.

The judgment will be modified on Mall's appeal in two particulars: (1) Mall will be allowed interest from February 19, 1948, to March 15, 1951, on $23,730.94, the amount due it for goods sold and delivered; (2) the amount due Far West from Mall will be reduced by $9,290.81 (the difference between a twenty-five and a five per cent commission on Montgomery Ward sales between August 1, 1947, and March 31, 1948, in Far West's protected territory). The judgment is affirmed on Far West's cross-appeal. Mall will recover its costs on this appeal.

GRADY, C. J., DONWORTH, and WEAVER, JJ., concur.

SCHWELLENBACH, J., concurs in the result.

———

September 25, 1954. Petition for rehearing denied.